# United States Court of Appeals

## For the First Circuit

No. 02-2606

ADEL NAGI EL MORAGHY,

Petitioner,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Selya and Lynch, <u>Circuit Judges</u>,
Young,<sup>*</sup> <u>District Judge</u>.

<u>Saher Joseph Macarius</u> for petitioner.

<u>Harvey Kaplan</u>, with whom <u>Kaplan, O'Sullivan & Friedman</u>, <u>Beth Werlin</u>, <u>Mary A. Kenney</u>, <u>Nadine K. Wettstein</u>, and <u>Iris Gomez</u>, were on the brief for American Immigration Law Foundation, Massachusetts Law Reform Institute, and the New England Chapter of the American Immigration Lawyers Association, amici curiae.

<u>William C. Peachey</u>, Attorney, Office of Immigration Litigation, with whom <u>Robert D. McCallum, Jr.</u>, Assistant Attorney General, and <u>Linda S. Wernery</u>, Senior Litigation Counsel, were on brief for respondent.

June 12, 2003

---

<sup>*</sup> Of the U.S. District Court for the District of Massachusetts, sitting by designation.

**LYNCH**, <u>Circuit Judge</u>.  This case causes us to review a denial of an application for asylum by a Coptic Christian Egyptian national based on grounds of religious persecution.  Although the Board of Immigration Appeals ("BIA") affirmed the denial of asylum using its relatively new summary affirmance procedure, it should not have done so.  Basic flaws in the methodology and reasoning used by the Immigration Judge ("IJ") undercut his reasoning and so we remand.  We reject the notion that a State Department country condition report must specifically name a petitioner or his family members to be useful in the analysis of an asylum application.  We also reject the notion that an IJ, particularly in the absence of any adverse finding as to petitioner's credibility, may simply ignore the need to make a finding as to whether petitioner has demonstrated past persecution on account of one of the specified grounds for asylum.  But one swallow does not make a spring, and we reject again the petitioner's wholesale attack on the BIA's summary affirmance procedure.

Adel Nagi El Moraghy, a native and citizen of Egypt, entered the United States in 1999 on a tourist visa, which he subsequently overstayed.  In 2000, El Moraghy, a Coptic Christian, applied for asylum, citing incidents of persecution by Islamic fundamentalists while he was a student in the southern Egyptian town of Assiut.  His application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT")

was rejected by an IJ on May 16, 2001. El Moraghy appealed this decision to the BIA, which upheld without opinion the decision of the IJ. See 8 C.F.R. § 3.1(e)(4) (2003). El Moraghy, supported by amici curiae, now petitions this court for review of the BIA's decision. We remand for further consideration, finding that the IJ's improper use of State Department country condition reports and failure to make findings as to past persecution or credibility prevent us from resolving the case on those grounds.[1] We take no view as to the petitioner's eligibility vel non for any of the relief that he seeks.

I.

El Moraghy, then twenty-three years old, entered the United States on a tourist visa at Newark Airport on February 18, 1999. He initially resided in Oklahoma City with his maternal uncle, Dr. Wagdy Rizk, and later moved to Milford, Massachusetts. During this time, El Moraghy received financial support from Dr. Rizk and family in Egypt. After the expiration of his six-month tourist visa, El Moraghy submitted an application for asylum on February 10, 2000, including a signed statement, dated January 25, 2000, detailing alleged incidents of persecution in Egypt. On March 23, 2000, El Moraghy was interviewed by an asylum officer who

---

[1] The Attorney General has been substituted for the Immigration and Naturalization Service as respondent with the implementation of the Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 471, 116 Stat. 2135, at 2192, 2205 (Nov. 25, 2002). See 8 U.S.C. § 1252(b)(3)(A) (2000).

found him not credible. Four days later, on March 27, the Immigration and Naturalization Service issued a Notice to Appear to El Moraghy for overstaying his visa.

El Moraghy conceded deportability, but applied for asylum, withholding of removal, and non-return under Article III of the CAT. He said he sought "to escape the persecution of the Muslim Fundamentalists in Egypt, because I am a Coptic Christian." El Moraghy alleged that his life had been threatened on several occasions because of his religious beliefs, aggravated by his friendship with a Muslim woman. "The Egyptian government," he said, "does little to protect Christians from attacks of the Muslim Fundamentalists." According to El Moraghy, if he were forced to return to Egypt, he would "be tortured or most likely killed by Muslim Fundamentalists."

At his June 22, 2000 hearing, El Moraghy described a handful of purported instances of persecution in Egypt. All of these incidents happened in or near Assiut, Egypt, a town six hours to the south of Cairo by train, where El Moraghy attended college. El Moraghy is an active Orthodox Coptic Christian who grew up in Cairo. Most Egyptians are Sunni Muslims, but approximately ten per cent, or more than six million, belong to the Coptic Orthodox Church. After his graduation from high school in 1993, El Moraghy was assigned by the government to attend college in Assiut. El Moraghy had no choice of where to attend college, and his later

-4-

requests to transfer out of Assiut were denied.  We describe the five incidents as related by El Moraghy, as to which the IJ made no credibility finding.

The first incident occurred shortly after El Moraghy arrived at Assiut University in 1993.  El Moraghy approached a group of students to ask them about class schedules.  When the students noticed the cross tattooed on El Moraghy's right hand, they verbally abused him and then departed.  No physical violence occurred at this time.  A second incident took place in February 1994.  El Moraghy was prevented from returning to his apartment by individuals who told him that he would defile the ground outside the mosque near his apartment, and that he had to wait until after Friday prayers to return home.

The third incident took place on March 4, 1994.  El Moraghy met a girl he knew from church named Enass Abrahin Zaki on campus.  As they spoke, four students he described as members of fundamentalist groups surrounded them and told him that he was violating their rules by speaking with a woman.  As El Moraghy walked home afterwards, he was stopped by the same four individuals, who pushed him into a secluded area and began beating him.  They hit him with belts and kicked him until they heard someone coming and ran away.  During the beating they called El Moraghy an "infidel" and an "animal."  El Moraghy's shoulder was dislocated, his glasses were broken, and he felt concussed as a

result of the beating.  He subsequently saw a doctor, who referred him to a hospital in Assiut.  El Moraghy submitted a document purporting to be a certificate from St. Mary's Medical Center in Assiut that stated that on March 5, 1994, "Adel Nagi Naser Allah"[2] was examined and found to have "a dislocated right shoulder, concussion, and scratches around the right eye.  This could be [the] result of striking a rough solid object.  The scratches around the right eye could possibly happen as a result of shattered glass."[3]  El Moraghy said he stayed in the hospital for three days, but he did not report the incident to the police because he feared that the fundamentalists would find out and kill him.

A fourth incident occurred in 1995.  El Moraghy was visiting a monastery, Daral Maker or Dar El Muhurak, more than an hour away from Assiut.  El Moraghy hired a taxi to drive him part of the way back from the monastery.  The taxi driver was playing an anti-Christian tape.  El Moraghy asked him not to play the tape because he was a Christian; the driver responded by forcing him out of the taxi, hitting El Moraghy hard enough to cause bleeding from

---

[2]  Arabic employs a patronymic naming system.  El Moraghy's certificate from Assiut University refers to him as Mr. Adel Nagy Nasrallah Hanna.

[3]  El Moraghy submitted this certificate during the course of the June 2000 hearing.  At the conclusion of the hearing, a continuance was granted, in part, to allow El Moraghy to acquire his complete hospital records, and to authenticate them according to 8 C.F.R. § 287.6.  No further records were forthcoming at the subsequent May 2001 hearing, however.

one ear, and leaving him on the highway.  Again, El Moraghy did not report the incident to the police because he feared retribution.

The final incident grew out of El Moraghy's friendship with a girl, Nadia Ziki, a Muslim who lived in Assiut.  El Moraghy met Ziki on the train in 1995 when she was visiting an uncle in Cairo.  They became friends, and Ziki asked El Moraghy to take her along to see the monastery.  Ziki said that, as an educated person, she wanted to go to see the monastery herself, even though it might be dangerous and she would be considered polluted in the eyes of fundamentalists.  El Moraghy eventually agreed to take her, and they went together five or six times.

On their last visit to the monastery, on July 27, 1998, they were stopped and forced out of Ziki's car on the way back to Assiut by members of a group El Moraghy identified as Islamic fundamentalists.  El Moraghy and Ziki were driven, blindfolded, to an unknown location.  There they met with the group's leader.  The group's leader told them that the group knew about the relationship between El Moraghy and Ziki, and that the only solution was for El Moraghy to become Muslim and to marry her.  (According to El Moraghy, the relationship was a platonic one.)  El Moraghy, the leader demanded, must convert from Christianity to Islam.  When El Moraghy said he could not become Muslim, he was struck.  A paper was brought to El Moraghy, who was told that signing it would amount to a conversion.  Seeing no other way out, El Moraghy signed

the paper, which committed him to become a Muslim.  El Moraghy and Ziki were then told that they had to wait for the official in charge of conducting marriages to arrive, but it turned out that he was not available.  They were then told that they could leave, but would have to return to complete the marriage.

Afterwards, El Moraghy took the train to Cairo, where he met with a priest, named Arsanwos Basyeley Ragheb, from his church.  The priest told him he should flee, and recommended that he go to the Marmina monastery in Alexandria.  El Moraghy submitted a statement from Arsanwos.  In it, Arsanwos recalled advising El Moraghy to go to the St. Mina monastery to escape "the tremendous amount of psychological pressure that he was exposed to."  Arsanwos also said that he counseled El Moraghy to stay in the United States "to get away from th[e] difficult atmosphere he was living in."

El Moraghy stayed at the monastery for a while, and then returned to Cairo, where he resided with his grandmother.  From November 1998 until February 1999, El Moraghy worked at the Sonesta Hotel in Cairo as a cashier, because he needed certification of employment to be able to travel to the United States.  El Moraghy had previously worked at the Sonesta hotel during summer vacations.  During the two months before his departure, El Moraghy did not return to his family home out of fear.  He said that his mother had received anonymous calls inquiring if he was there.  El Moraghy's theory was that he was a marked man, even in Cairo, based on the

earlier events and his signed promise and subsequent failure to convert to Islam.

El Moraghy's uncle, Dr. Rizk, testified at a second hearing on May 16, 2001 that El Moraghy had told Dr. Rizk that he had been beaten on multiple occasions, that his shoulder had been dislocated, that the trouble had been caused by his friendship, as a Christian, with a Muslim woman, and that his life was in danger in Egypt. Dr. Rizk had also spoken to El Moraghy's mother, both on the telephone and in person during a 2000 visit to Egypt, and said that El Moraghy's family was very worried about him and feared that he would be harmed if he returned to Egypt, but did not specify their reasons for the fear. Dr. Rizk was cross-examined by the IJ about his statement that El Moraghy had told him he had read the conversion document he had been forced to sign; at the earlier hearing El Moraghy had testified that he had not read the document. This discrepancy concerned the IJ.

During the June 2000 hearing, El Moraghy testified that none of his nuclear family members had experienced problems with Islamic fundamentalists. He did know one person -- a friend's mother -- who was killed in Egypt. But he remained afraid that he would be killed if he returned to Egypt because once he had been identified by the fundamentalists as a target, he would remain a marked man.

El Moraghy argued that the government could not control fundamentalists and did little to protect Coptic Christians. To demonstrate this, he submitted State Department country condition reports for Egypt and newspaper articles describing anti-Coptic terrorism in Egypt. According to the 1999 country condition report, there are significant legal and social impediments placed on Christians in Egypt. While Coptic Christians had previously been the target of violent assaults, "there were no reports of terrorist attacks against Christians during [1999]." The government had begun prosecutions against some perpetrators of previous attacks against Coptic Christians, but "some members of the Christian community do not believe that the government is sufficiently vigorous in its efforts to prevent attacks." The country condition report for 1998 had noted that "Coptic Christians are the objects of occasional violent assaults by the Islamic Group and other terrorists. During [1998], extremists were responsible for killing eight Christians in the Minya governorate [near Assiut]." A 1996 country condition report described continuing violence against Coptic Christians, with at least twenty-two killed, including a group of eight in Assiut.

El Moraghy also submitted numerous newspaper articles and other sources describing the history of persecution of Coptic Christians in Egypt. The Islamic terrorist group Gama'a Islamiya carried out attacks on Coptic Christians from 1992 on, operating

mainly in the southern (or upper) regions of Egypt, including Minya and Assiut governorates, but also in large towns such as Alexandria and Cairo.  In May 1992, thirteen Coptic Christians were killed in Assiut in a single day.  Nearly thirty people were killed in Assiut in two weeks in February 1996.  According to a 1998 Human Rights Watch World Report, eight or more Coptic Christian students were killed at a church youth group meeting in February 1997 in Minya governorate.  Newspaper accounts also relate kidnappings and forced conversions of Christians.

The IJ issued an oral decision on May 16, 2001.  He denied El Moraghy's application for asylum, withholding of removal, and relief under the CAT.  He granted El Moraghy's request for voluntary departure.  The IJ noted that El Moraghy had attached State Department country reports for Egypt for 1998 and 1999, and other accounts of Muslim fundamentalism in Egypt, but said "[a] review of those documents does not refer to the respondent or any members of his family in Egypt."  The IJ dismissed the purported medical certificate from St. Mary's, saying that there were no hospital records to corroborate El Moraghy's account.  Furthermore, he declared:

> Outside of the respondent's self-serving declaration of what happened to him in Egypt, other than what the witness' uncle has testified in this proceedings has told him after coming to the United States, there is not one scintilla or iota of evidence to corroborate the respondent's self-serving declaration of what happened to him in Egypt and why he left Egypt and came to the United States.

-11-

The IJ concluded that a similarly-situated person would not fear persecution, nor would persecution be likely if El Moraghy were to return to Egypt. The IJ did not make any finding that El Moraghy was not credible, nor did he address whether El Moraghy had suffered past persecution.

El Moraghy appealed the IJ's decision to the BIA. On November 14, 2002, the BIA affirmed without opinion the IJ's decision, relying on the summary affirmance procedure provided for in 8 C.F.R. § 3.1(e)(4). El Moraghy, supported by amici,[4] now challenges the BIA's ruling, arguing that the BIA's affirmance was in error, and that the IJ improperly failed to make a credibility finding or analyze whether El Moraghy had suffered past persecution. El Moraghy and amici also contend that the BIA's application of the summary affirmance procedure was in error, and that the summary affirmance regulations prevent judicial review of the BIA's actions.

## II.

The BIA's determination "must be upheld if supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation omitted). "It can be reversed only if

---

[4] The American Immigration Law Foundation, the Massachusetts Law Reform Institute and the New England chapter of the American Immigration Lawyers Association filed a joint amici curiae brief. We acknowledge their assistance with gratitude.

the evidence presented by [petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed."  Id.; accord Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).  We "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence."  Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Our review is deferential, Vazquez v. INS, 177 F.3d 62, 64 (1st Cir. 1999), but "deference is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the immigration judge."  Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) (citations omitted).

The petitioner bears the burden of establishing eligibility for asylum by proving that he qualifies as a refugee. 8 U.S.C. § 1158(b)(1) (2002).  A petitioner can do so by two routes: "(1) by demonstrating past persecution, thus creating a presumption of a well-founded fear of persecution; or (2) by demonstrating a well-founded fear of persecution."  Yatskin v. INS, 255 F.3d 5, 9 (1st Cir. 2001) (citing 8 C.F.R. § 208.13(b)).  To prove past persecution, an applicant must demonstrate that he has suffered persecution on one of the five enumerated grounds: race, religion, nationality, membership in a particular social group, or political opinion.  Id. § 208.13(b)(1).  To establish a well-founded fear of future persecution, applicants can either offer

specific proof, or they can claim the benefit of a regulatory presumption based on proof of past persecution. Guzman v. INS, 327 F.3d 11, 15 (1st Cir. 2003) (citing 8 C.F.R. § 208.13(b)(1)); Velasquez v. Ashcroft, 316 F.3d 31, 35 (1st Cir. 2002) (same).

Once an applicant "has been found to have established such past persecution" he or she "shall also be presumed to have a well-founded fear of persecution on the basis of the[ir] original claim." 8 C.F.R. § 208.13(b)(1). That presumption can be rebutted by an IJ's finding by a preponderance of the evidence either (1) that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or (2) that "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country . . . ." Id. § 208.13(b)(1)(i)(A)-(B).

In order to demonstrate a well-founded fear of persecution by direct evidence, a petitioner must satisfy both an objective and a subjective test. Velasquez, 316 F.3d at 35. "Under the subjective requirement, a petitioner must prove his fear is genuine, while the objective component requires showing by 'credible, direct and specific evidence' that this fear is reasonable." Id. (citation omitted) (quoting Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992)).

-14-

Even under this deferential review of agency decisions, we conclude the IJ's decision cannot, on this record, be upheld. The IJ fails to state conclusions at all on several important issues. The IJ misused State Department country reports and failed to address the issue of past persecution. In the absence of a finding that the petitioner was not credible, the decision cannot be affirmed as being based on substantial evidence. We require the BIA "to exercise independent judgment, and to state plainly its reasons for granting or denying relief." Chen v. INS, 87 F.3d 5, 7 (1st Cir. 1996); see also Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998) ("The need for clear administrative findings is implicit in the statute under which we review the BIA's decision."). "[A] reviewing court should judge the action of an administrative agency based only on reasoning provided by the agency, and not based on grounds constructed by the reviewing court." Yatskin, 255 F.3d at 9 (citing Gailius, 147 F.3d at 44). When the BIA summarily affirms the IJ's opinion, as here, we review the decision of the IJ. Herbert v. Ashcroft, 325 F.3d 68, 71 (1st Cir. 2003); Albathani, 318 F.3d at 373.

The BIA has changed its regulations to provide, "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). The old regulations explicitly said that credibility should be judged "in light of general conditions in the applicant's

country of nationality or last habitual residence." Under the old regulations, courts and the BIA routinely used country condition reports to inform credibility judgments. See, e.g., Cordero-Trejo, 40 F.3d at 491-92. Country condition reports are still relevant as to credibility, whether or not they specifically name the applicant. See 3 C. Gordon, S. Mailman & S. Yale-Loehr, Immigration Law & Procedure § 33.04[3][f], at pp. 33-52.21 to 23 (2003) (collecting cases applying old and new versions of § 208.13(a)). While State Department reports are "generally regarded by courts of law as reliable," Cordero-Trejo, 40 F.3d at 492 n.6, they are not binding on either the agency or the courts, Gailius, 147 F.3d at 46. Used in their normal fashion, namely, to provide a context for assessing the credibility of a petitioner's account, country reports can cut two ways: they can either help or harm a petitioner's case, depending on whether or not they corroborate the petitioner's tale.

The IJ here, however, appears to have employed the country condition reports solely as a test of direct corroboration, rather than for the purposes of providing context and generalized credibility assessment. That is, the IJ appears to have improperly imposed a requirement that the country condition reports refer specifically to the petitioner or his family members. Rather than reading State Department and other materials for a general description of conditions faced by Coptic Christians in Egypt,

-16-

which would tend to corroborate the petitioner's claim or not, the IJ appears merely to have searched for mentions of El Moraghy and his family members. After each of the two State Department country reports and other materials, the IJ noted "a review of the document does not refer to the respondent or any members of his family in Egypt." This sentence is repeated three times in the IJ's opinion, and is followed by no further analysis of the documents in question or how that information supports or does not support petitioner's claims. It is unrealistic to expect that country condition reports could contain references to all citizens of that country who have faced, or might face, persecution on one of the specified grounds. While country reports may, in rare instances involving prominent dissidents, contain direct corroboration of a petitioner's account, to demand that they do so and otherwise eschew any analysis of the evidence is clearly erroneous.

In the present case, the IJ did not provide any finding at all that El Moraghy had not suffered past persecution. Another use of the country reports is by the government to show changed conditions after an applicant has demonstrated past persecution.[5] Changed country conditions rebut the presumption of future persecution. The government here has not argued changed country conditions, and the IJ made no finding on the point. But the IJ

_____

[5] Evidence of changed country conditions can also be used by the petitioner as part of a motion to reopen. See 8 C.F.R. 3.2(c)(3)(ii).

-17-

here failed to make any finding as to past persecution, a failure which is independently significant.

In _Yatskin_, we noted the difficulty of conducting meaningful judicial review of a decision by the agency finding "no well-founded fear of persecution" when there was no underlying determination of whether there had been past persecution. 255 F.3d at 9. In _Yatskin_, we were able to avoid the issue and affirm the BIA because, even taking Yatskin's testimony as true, the BIA was well-justified in concluding that changed country conditions meant Yatskin did not have an objectively reasonable fear of persecution. Here, we have no such finding by either the BIA or the IJ. It is not the job of the courts of appeals to make such findings for any agency; here, "[n]o finding . . . was made by the agency, and it is for the agency, not the courts, to make findings of fact." _Gailius_, 147 F.3d at 44. The absence of reasoned discussion of past persecution undercuts any meaningful review of the IJ's fear of future persecution finding, because we do not know whether El Moraghy should have had the benefit of the regulatory presumption of fear of persecution based on prior events. _See_ 8 C.F.R. § 208.13(b)(1).

Finally, the IJ's decision cannot be upheld on credibility grounds because here too the IJ has not made any finding. It may be that the IJ believed El Moraghy not to be credible, which was the conclusion of the initial interviewing

-18-

officer. If so, the IJ neither made such a finding, nor explained the basis in evidence for such a finding, both of which are basic errors. "[T]he IJ must, if he or she chooses to reject [petitioner's] testimony as lacking credibility, offer a specific, cogent reason for [the IJ's] disbelief." Gailius, 147 F.3d at 47 (internal quotation omitted). While we defer to the IJ on credibility questions, that deference is expressly conditioned on support in the record, as evidenced by specific findings:

> [W]hen a hearing officer who saw and heard a witness makes an adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect. While the obligation to defer should not be confused with an obligation to rubber-stamp the hearing officer's credibility call, such a determination merits judicial approbation as long as the findings on which it rests have sufficiently sturdy roots in the administrative record.

Aguilar-Solis v. INS, 168 F.3d 565, 571 (1st Cir. 1999) (citations omitted) (emphasis added). The IJ's passing comment that El Moraghy's account is self-serving does not suffice. The testimony of every applicant for asylum is self-serving. This does not make it untrue.

Moreover, in his opinion, the IJ did not make a finding that, even if everything El Moraghy said were true and even if the country conditions had been properly considered as evidence of context, what was presented by petitioner did not amount to either past persecution or a well-founded fear of persecution. Neither

-19-

the IJ nor the BIA make any such finding which would remedy the inadequacies of the IJ's reasoning.

If the BIA or the IJ has not ruled on an issue, either explicitly or implicitly, the respondent cannot ask us to uphold a decision on those grounds. See Gailius, 147 F.3d at 44. We cannot say the evidence compels a conclusion either way; in light of the misuse of the country condition reports and the absence of key findings, we remand. See id. at 47; Osorio v. INS, 99 F.3d 928, 933 (9th Cir. 1996).

We do not consider El Moraghy's withholding of removal claim or his CAT claim, both of which require that petitioner meet a higher burden of proof. See Aguilar-Solis, 168 F.3d at 569 n.3 (withholding of deportation requires a clear probability of persecution); 8 C.F.R. § 208.16(c)(2) (applicant for relief under the CAT bears burden of proof to demonstrate that it is more likely than not that he would be tortured if removed to the proposed country of removal).

III.

Petitioner and amici also ask us to reverse on the ground that the BIA failed to satisfy its own regulatory requirements for summarily affirming the IJ's opinion, and that the summary affirmance regulations themselves improperly insulate the appeal process from judicial review. We have already rejected the second ground in Albathani and do so again today. As to the first ground,

-20-

if the BIA erred in using its affirmance without opinion ("AWO") procedure, our remand cures the problem. See generally Albathani, 318 F.3d at 378.

The AWO procedure allows affirmance by a single Board member, rather than the usual three-member review. The IJ's opinion is affirmed without further analysis, with the statement, "The Board affirms, without opinion, the result of the decision below." 8 C.F.R. § 3.1(e)(4)(B)(ii). The AWO procedure is available when a Board member determines that the result reached by the IJ was correct, that any errors in the decision were harmless or non-material, and that either the issue is squarely controlled by precedent and does not involve a novel fact pattern, or that the factual and legal questions raised are so insubstantial that three-member review is not warranted. Id. § 3.1(e)(4)(A)-(B). The regulations governing the AWO procedure were first promulgated in 1999 in order to address a growing backlog of immigration appeals. See Albathani, 318 F.3d at 376 n.8.

In Albathani, this court upheld the streamlining regulations establishing the AWO procedure as constituting a legitimate exercise of the Attorney General's discretion to fashion its own rules of procedure. Id. at 377. The provision of reasons in the IJ's opinion satisfies the requirement in SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1946), that administrative agencies set forth with clarity the basis for their decisions, Albathani,

-21-

318 F.3d at 377, and the AWO procedure did not prevent there being meaningful review.

Nonetheless, as we warned in <u>Albathani</u>:

> [I]f the BIA identifies an alternative satisfactory ground for upholding denial of asylum in a case with an otherwise unsatisfactory decision by the IJ, it must state it or risk remand. Ordinarily, the case will be remanded to the agency [by the court of appeals], and the agency will not, in the end, have saved any time or effort.

<u>Id.</u> at 378. Here, streamlining a case "in which the reasoning proffered by the IJ is faulty" has resulted only in additional lost time and judicial resources. <u>See</u> <u>id.</u> If, in the end, El Moraghy is granted the discretionary relief he seeks, the cost will have been borne mostly by the courts, which have done what the BIA should have done. And if El Moraghy is properly denied relief, then the cost of the summary affirmance procedure will be, in addition, that an alien who should have been removed has stayed here even longer.

Still, while the IJ's opinion here was flawed, the summary affirmance of one flawed IJ decision by the BIA does not rise to the level of "evidence of systemic violation by the BIA of its regulations" we identified as a precursor to even addressing the question of whether a more searching review of the application of the AWO regulations is available. <u>Id.</u> at 378-79. We need not address the question of whether the decision to streamline this

case was proper, because our review of the IJ's decision necessitates a remand to the BIA for further proceedings.

IV.

The order of the BIA is **<u>vacated</u>**, and the case is **<u>remanded</u>** to the BIA for further proceedings consistent with this opinion.