**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals

## For the First Circuit

No. 03-1272

HENRY KIYAGA,
Petitioner,

v.

JOHN ASHCROFT, Attorney General,
Respondent.

---

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

---

Before
Selya, Circuit Judge,
Stapleton,* Senior Circuit Judge,
and Howard, Circuit Judge

---

Monique H. Kornfeld, for petitioner.
Margaret K. Taylor, with whom Robert D. McCallum, Jr.,
Assistant Attorney General, Civil Division, Mark C. Walters,
Assistant Director, and Jacqueline R. Dryden, Office of Immigration
Litigation, United States Department of Justice, Civil Division,
were on the brief, for respondent.

---

October 8, 2003

---

* Of the Third Circuit, sitting by designation.

**STAPLETON**, <u>Circuit Judge</u>.

I.

Henry Kiyaga ("Petitioner"), a citizen of Uganda, appeals the decision of the Board of Immigration Appeals ("BIA"), which affirmed, without opinion, the Immigration Judge's ("IJ") denial of his application for asylum.  The IJ held that Petitioner was barred from being granted asylum by 8 U.S.C. § 1101(a)(42)(B) which stipulates that an alien is not a refugee for purposes of asylum if he has persecuted others on account of nationality or political opinion.  Petitioner challenges this holding.  He also alleges that the BIA erred in applying its summary affirmance procedure to his case.

II.

Petitioner's military service in Uganda lasted from 1985 to 1999.  In 1985, he began his military career by joining the Federal Democratic Army ("FDA"), a guerilla group opposing then-Ugandan President Otobe.  Another guerilla group, the National Resistance Army ("NRA"), was commanded by Yoweri Museveni.  The NRA toppled the existing Ugandan government in 1986 and integrated the FDA and other rival factions into one army.  Petitioner served with the NRA, which later changed its name to the Ugandan People's Defense Force ("UPDF"), from 1986-1999.  Petitioner was placed in the mobile unit of the Fourth Division.  During that period, Petitioner was involved in several regional conflicts in Uganda,

-2-

Rwanda, and Zaire. Zaire subsequently became the Democratic Republic of Congo ("the Congo").

In 1999, Petitioner was imprisoned by the UPDF. Petitioner asserts that he was jailed for complaining about the UPDF's presence in the Congo, and the death of so many UPDF soldiers in the conflict. Petitioner was charged with planning to plot a coup against the UPDF, conspiring to kill fellow soldiers, conspiring to control Kisangani, Congo, and insubordination. Kiyaga asserts that he was tortured while in prison. At the IJ proceeding, he provided photographic evidence of his injuries that he claims resulted from the torture. After a few days of imprisonment, Kiyaga was allowed to escape. In October, 1999, Kiyaga fled to the United States.

III.

Kiyaga applied for asylum, claiming that he had suffered past persecution and had a well-founded fear of future persecution. 8 U.S.C. § 1158(b)(1). His application was denied. Although the IJ concluded that Petitioner had carried his burden of showing past persecution, he held that asylum was barred by 8 U.S.C. § 1101(a)(42)(B), which provides as follows:

> The term "refugee" does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.

After concluding that Petitioner had the burden of proving he was

a refugee, the IJ found that Petitioner's insistence that he had not persecuted others on political grounds was simply not credible and, accordingly, insufficient to carry that burden. The IJ went on to find that the "documentary evidence in the record, as well as the inconsistencies within the [Petitioner's] testimony regarding the killing of civilians, establish by a preponderance of the evidence that the [Petitioner] persecuted others."

More specifically, the IJ found that "the record overwhelmingly establish[ed] that the UPDF, including the Fourth Division, was directly responsible for human rights violations against civilians, on account of their nationality and political opposition towards the ruling government." The court also pointed to specific atrocities committed by members of Petitioner's unit and division, which occurred while Petitioner was a member of that force. The IJ, citing Fedorenko v. United States, 449 U.S. 490, 494 (1981), held the Petitioner accountable for the actions of his mobile brigade unit because "he was present when these incidents happened, he was issued a uniform and armed with a rifle to patrol." The court found that although the Petitioner claimed that he never harmed civilians, the fact that he supplied soldiers with food, clothing, and other supplies assisted the soldiers in persecuting others. The IJ stated that "[b]ecause the [Petitioner] did not act to stop civilian killings, he enabled persecution on account of nationality and political opinion." Id. Finally, the

-4-

IJ noted that, although "activity directly related to a civil war, such as forced recruitment, destruction of property, military attacks or mere membership in an organization is not necessarily persecution,"[1] the Petitioner "was involved in activities beyond the 'natural occurrences' of civil war." The IJ based this finding on the fact that Petitioner was a member of a governmental organization that participated in gross human rights violations on account of nationality and political opinion.

The IJ ordered Petitioner removed to Uganda, and the BIA summarily affirmed the IJ's decision without opinion. 8 C.F.R. § 3.1(e)(4) (now 8 C.F.R. § 1003.1(e)(4)).

IV.

Kiyaga timely petitioned this Court for review of the BIA's judgment. We have jurisdiction to review the final order of removal pursuant to 8 U.S.C. § 1252(a). When the BIA applies its streamlined affirmance-without-opinion procedure, *see* 8 C.F.R. § 1003.1(e)(4), we review the decision of the IJ. See Albathani v. INS, 318 F.3d 365, 378 (1st Cir. 2003) (stating that a court bases its review on the IJ's decision and the record on which it is based when the 8 C.F.R. 3.1(a)(7)[2] streamlining procedure is used); El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003) (applying

_____

[1]See Matter of Rodriguez-Majano, 19 I. & N. Dec. 811 (BIA 1988).

[2]Now 8 C.F.R. § 1003.1(a)(7).

-5-

*Albathani* to the affirmance without opinion procedure in 8 C.F.R. § 3.1(e)(4)).

V.

To be eligible for asylum, an alien has the burden of showing that he or she is a "refugee." 8 U.S.C. § 1158(b)(1); Fesseha v. Ashcroft, 333 F.3d 13, 18 (1st Cir. 2003). As we have indicated, under § 1101(a)(42)(B), an alien cannot be a "refugee" if he or she has assisted or otherwise participated in the persecution of others on account of political opinions. Moreover, as we have further noted, the IJ concluded that if there is evidence of such assistance or participation, the "applicant [has] the burden of proving by a preponderance of the evidence that he or she did not so act." As is evident from Petitioner's briefing and as expressly confirmed by Petitioner's counsel at oral argument, Petitioner does not challenge any of these legal propositions. His argument is rather that the record will not support a finding that asylum is barred by § 1101(a)(42)(B). We cannot agree.

Evidence was produced before the IJ tending the show that the Petitioner had assisted in the persecution of others on account of a prohibited ground. This included evidence that the UPDF forcefully relocated civilians into "protected camps." Civilians were beaten if they refused to comply. See Amnesty International, Uganda: Breaking the Circle: Protecting Human Rights in the Norther War Zone (1999). If civilians left the protected camps,

they were assumed to be members of the opposing force. Evidence also indicated that the UPDF mobile troops had shelled villages where civilians had returned from the protected camps to cultivate crops. Finally, there was evidence that UPDF soldiers in the Fourth Division were involved in the lynching of civilians on August 16, 1996, in Gulu, Uganda. This was Petitioner's military division and he admits to being in Gulu at this time. Additional evidence indicated that the mobile patrol in which Petitioner served was involved in killing 30 children in the Kitgum District in March of 1998, when it ambushed a group of opposing forces who were holding the children captive. Finally, evidence was produced that Petitioner had indicated to an asylum officer in an interview that he had killed or harmed non-combative civilians on four different occasions in Uganda.

In response to this evidence, Petitioner attempted to carry his burden of showing he was a refugee by offering his own testimony that he had never participated in persecuting others. The IJ concluded, however, that this testimony was not credible. This credibility determination effectively resolves Petitioner's asylum claim because no other evidence was presented to the Immigration Court that could prove by a preponderance of the evidence that Petitioner did not persecute or assist in the persecution of others. Therefore, if the IJ's credibility determination survives our scrutiny, we must deny the petition for

review.

The IJ's credibility determination is reviewed for substantial evidence and "must be upheld if supported by reasonable, substantial and probative evidence on the record considered as a whole." Mendes v. INS, 197 F.3d 6, 13 (1st Cir. 1999) (internal quotations omitted); see also Mediouni v. INS, 314 F.3d 24, 26-27 (1st Cir. 2002). We will reverse a finding of fact, such as a credibility determination, only if "the evidence is so compelling that no reasonable fact-finder could fail to reach the contrary conclusion." Oliva-Muralles v. Ashcroft, 328 F.3d 25, 27 (1st Cir. 2003).

The IJ's conclusion that Petitioner's denial of participation in persecution lacks credibility was based primarily on the fact that Petitioner provided inconsistent and evasive responses to questions regarding his activities while serving in the UPDF. As the IJ explained:

> When asked about the one time he served on the front line, he says he never killed any civilian. On another occasion, he says he never killed any civilians intentionally, although he may have killed a civilian accidentally. When asked by the Service on cross-examination, he was unable to give a straight answer.

The IJ also pointed out the Assessment to Refer, which asserted that Petitioner had admitted to killing civilians on four occasions, and the statement about civilians having to die if they were caught between enemy forces. There is substantial evidence

-8-

supporting these conclusions of the IJ.

In the Assessment to Refer, the asylum officer who interviewed Petitioner asserted that Petitioner had admitted to killing non-combative civilians on four separate occasions in Uganda. He also quoted the Petitioner as stating, "if they [civilians] were in the middle, they had to die, ... we were ordered to do so, we had to fight."

At Petitioner's first hearing, he provided the following responses to the government's questions:

> Q. Sir, did you see civilians being killed while you were involved in combat in the army?
>
> A. Yes, I did.
>
> . . .
>
> Q. Sir, did you ever kill civilians during your period in the army?
>
> A. No, in time I have never killed a civilian. I have never killed a civilian intentional unless it happened by accident[.] [B]ut I have never killed any civilian intentionally.
>
> . . .
>
> Q. Sir, did you ever – do you believe that you ever killed civilians accidentally?
>
> A. Well, it could be, I cannot say no or yes,
>
> . . .

At Petitioner's second removal hearing on April 5, 2001, he stated the following:

Q. Sir, is it your testimony that throughout your 13 year military career, you were never involved in the killing of civilians?

A. Personally, the entire period I was in the military, I have never killed a civilian nor tortured one.

. . .

Q. Sir, did you tell the asylum officer during your asylum interview that you were involved in the killing of civilians?

A. That question was raised to me and I answered him directly that I have never participated in the killing of civilians.

Petitioner was confronted with the Assessment to Refer memo, written by the asylum officer, quoting the "if [civilians] were in the middle, they had to die," language. The following colloquy took place:

Q. Sir, . . . the document says that the applicant admitted that he has killed or harmed non-combat civilians on four different occasions.

. . .

Q. Sir, is now your testimony that you did not say that you had killed or harmed civilians on four different occasions?

. . .

A. Unless the officer did not understand the language I tried to explain to him, but I remember the question was raised to me and I answered that I have never participated in the killing of civilians.

The Petitioner explained that the interview with the asylum officer was conducted in English, and that he had had a

difficult time communicating in that interview.  Then the following

exchange occurred:

> A.   Sir, did you say and I am quoting "Civilians were in the middle and they had to die?"
>
> . . .
>
> Q. Yes, when the question was raised to me, I answered him and said, and tried to explain to him that when there is fighting going on and the civilians are in the middle, they can easily be killed, but I have never told him that I have killed any civilian and I personally have never intentionally killed any civilian.

Petitioner cites Hartooni v. INS, 21 F.3d 336, 342 (9th

Cir. 1994), for the proposition that the IJ must provide a

legitimate articulable basis for his credibility determination.  He

asserts that the IJ failed in this respect because he limited his

analysis of Petitioner's credibility to only one area, his

testimony about whether he had killed civilians, when the whole of

his testimony was otherwise consistent and believable.

Hartooni holds that the IJ "must have a legitimate

articulable basis to question the petitioner's credibility, and

must offer a specific, cogent reason for any stated disbelief."  21

F.3d at 342.  As we have heretofore explained, however, the IJ did

provide a legitimate articulable basis to question the Petitioner's

credibility.

Petitioner also quotes a page from the Basic Law Manual,

produced by the INS, as authority for the proposition that "a claim

-11-

may be credible even though the claimant later submits information not submitted at the first examination." U.S. Dep't of Justice, Immigration and Naturalization Serv., The Basic Law Manual 105 (1994). Petitioner alleges that he did not have an interpreter at the first examination, which resulted in perceived inconsistencies with later interviews in which an interpreter was provided. He asserts his testimony at the removal proceeding was not truly inconsistent, but simply an attempt to clarify his earlier statements in a logical and direct manner.

The discrepancy in Petitioner's testimony does not simply reflect information that the Petitioner forgot to include in his first interview, which he is later elaborating or clarifying, as the cited passage in the Basic Law Manual appears to contemplate. It is an inconsistency in the testimony that makes it plausible, even likely, that the Petitioner is telling less than the whole truth regarding his conduct toward civilians.

Petitioner also alleges that the inconsistency in his testimony was not material because he consistently testified that he did not intentionally kill civilians. He insists that an inconsistency must "shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded." Matter of Bosuego, 17 I. & N. Dec. 125 (BIA 1979); accord Solis-Muela v. INS, 13 F.3d 372, 376-77 (10th Cir. 1993). Even if we were to apply a

materiality standard, however, Petitioner's inconsistent testimony regarding his participation in the killing of civilians was clearly relevant to an inquiry into the presence or absence of participation in persecution.

Finally, Petitioner cites Qiu v. Ashcroft, 329 F.3d 140, 156 (2d Cir. 2003), for the proposition that courts "have ... prodded immigration tribunals to give petitioners a chance to respond to the adjudicator's concerns about 'missing' or inconsistent evidence or testimony." Petitioner asserts that the IJ failed to give his asylum application the benefit of doubt and assist him in clarifying and substantiating his case. But Petitioner was given an opportunity to respond to the government's concerns about the inconsistent testimony. His answers to this questioning were not consistent or straightforward.

We hold that the IJ's credibility determination is supported by substantial evidence. The Petitioner's testimony was not only inconsistent with the testimony he gave at an earlier interview, it was inconsistent during the removal hearing itself. He at first states, unequivocally, that he killed no civilians during his military service. He then allows that he may have "accidentally" killed some. We would also note, although the IJ was not explicit in basing his credibility determination on this point, that Petitioner testified that he had no reason to believe that the Fourth Division of the UPDF had killed civilians.

-13-

However, evidence in the record indicated that members of the Fourth Division participated in the lynching of civilians in Gulu at the time Petitioner was stationed there. See Aguilar-Solis v. INS, 168 F.3d 565, 570-71 (1st Cir. 1999) (stating that it is not required that "a reviewing court must take every applicant's uncontradicted testimony at face value, for testimony is sometimes internally inconsistent or belied by prevailing circumstances" and that "when a hearing officer who saw and heard a witness makes adverse credibility determination and supports it with specific findings, an appellate court ordinarily should accord it significant respect").

For these reasons, the IJ's credibility determination withstands Petitioner's challenge. Having found that adverse credibility determination supported by substantial evidence, the Petitioner did not meet his burden of showing that the persecution-of-others bar did not apply to him. Therefore, we will deny the petition for review.

VI.

Petitioner argues that the BIA erred in applying 8 C.F.R. 3.1(e) (now 8 C.F.R. § 1003.1(e)), to affirm the result of the IJ's decision without opinion.

8 C.F.R. § 1003.1(e)(4), the section used by the BIA to affirm without opinion states, in pertinent part:

> Affirmance without opinion. (I) The Board
> member to whom a case is assigned shall affirm

-14-

the decision of the Service or the immigration judge, without opinion, if the Board member determines that the result reached in the decision under review was correct; that any errors in the decision under review were harmless or nonmaterial; and that

(A) The issues on appeal are squarely controlled by existing Board or federal court precedent and do not involve the application of precedent to a novel factual situation; or (B) The factual and legal issues raised on appeal are not so substantial that the case warrants the issuance of a written opinion in the case.

Petitioner asserts that the IJ's decision was not in conformity with the law or applicable precedents and was the result of clearly erroneous factual determinations. It is a subject of some debate whether we may review the BIA's decision to apply the streamlining regulation, itself. See Albathani, 318 F.3d at 378 ("Were there evidence of systemic violation by the BIA of its regulations, this would be a different case. We would then have to face, inter alia, the INS's claim that the decision to streamline an immigration appeal is not reviewable by the courts because these are matters committed to agency discretion."). Because we conclude that the IJ's credibility determination is clearly supported by substantial evidence, the Petitioner failed to meet his burden of showing his "refugee" status. Therefore, we shall dispose of Petitioner's argument without deciding whether we may review the BIA's decision to apply the streamlining regulation.

The petition for review is DENIED.