# United States Court of Appeals
## For the First Circuit

No. 03-1723

ALLEN MUKAMUSONI,

Petitioner,

v.

JOHN ASHCROFT, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before
Lynch, <u>Circuit Judge</u>,
Campbell and Stahl, <u>Senior Circuit Judges</u>.

<u>Daniel F. Cashman</u>, with whom <u>Cashman & Lovely, P.C.</u> and <u>Susanna L. Shafer</u> were on brief, for petitioner.
<u>Jamie M. Dowd</u>, Attorney, Office of Immigration Litigation, with whom <u>Peter D. Keisler</u>, Assistant Attorney General, and <u>David V. Bernal</u>, Assistant Director, Office of Immigration Litigation, were on brief, for respondent.

December 1, 2004

**LYNCH**, <u>**Circuit Judge**</u>.  Allen Mukamusoni, a woman native to Uganda and a citizen of both Uganda and Rwanda, entered the United States at Houston, Texas, on May 5, 1998 as a non-immigrant visitor for pleasure, with authorization to remain until November 4, 1998.  Mukamusoni remained in the United States beyond November 4, 1998, and the Immigration and Naturalization Service (INS)[1] charged her with removability.  Before Mukamusoni was charged with removability, she submitted an application for asylum, withholding of removal, protection under the Convention Against Torture (CAT), and voluntary departure.  The Immigration Judge (IJ) granted voluntary departure but denied her all other forms of relief on January 24, 2001, and the Board of Immigration Appeals (BIA) dismissed her appeal on April 22, 2003.  Mukamusoni then petitioned this court for review.  We vacate the BIA's order and remand.

## I.

We recount the facts as they are presented in Mukamusoni's oral testimony before the IJ and in documentation submitted in support of her application for asylum.

Mukamusoni was born to Rwandan refugee parents on May 17, 1977, in a Rwandan refugee camp in Uganda.  Her mother was a Tutsi while her father was a Hutu, and she had six siblings.  She had

---

[1]  In March 2003, the relevant functions of the INS were transferred into the new Department of Homeland Security and reorganized into the Bureau of Immigration and Customs Enforcement (BICE).  For simplicity, we refer to the agency throughout this opinion as the INS.

-2-

"always considered [her]self Rwandese."  Her father worked for a Ugandan family in Mbarara, Uganda, and that family told government officials that Mukamusoni was their daughter so that she could attend school in Uganda.  Mukamusoni was thus able to attend St. Mary's, a Catholic boarding school, and lived with the nuns of St. Mary's at their convent in Uganda.

Mukamusoni's family lived in Uganda until 1993, when every member of the family except Mukamusoni returned to Rwanda. Mukamusoni explained that at that time, many Rwandans in Uganda decided to return to Rwanda in order to "fight for their rights." The Rwandan migration was also partly due to Uganda's policy, which advocated the repatriation of Rwandan refugees to Rwanda. Mukamusoni herself stayed behind in Uganda to continue high school at St. Mary's.

In 1994, civil war broke out in Rwanda.  According to the 1999 Human Rights Watch Report for Rwanda (which was admitted into evidence), in 1994 "the Rwandan Patriotic Front (RPF), composed largely of Tutsi refugees who had spent decades in exile, defeated the Rwandan government, made up primarily of Hutu, who form the great majority of the Rwandan population. . . . [T]he [Hutu-dominated] government and army carried out a genocide of more than half a million Tutsi until they were stopped by the RPF."  After their defeat, members of the former government became leaders of the Hutu rebels, and "[s]ome of the insurgents, including several

senior officers who led the 1994 genocide, seemed ready to continue annihilating the Tutsi."

During the genocide of the Tutsi in Rwanda, Mukamusoni's father was originally in the army of the Rwandan Patriotic Front (RPF), but after some time he decided to desert the RPF and joined the Hutu rebels because he was Hutu himself. Mukamusoni's eldest brother joined her father with the Hutu rebel forces during the war, and he was killed in Kigali, Rwanda in 1994. Mukamusoni's other siblings and her mother lived in a refugee camp at Mutara, Rwanda during this time. Mukamusoni said that even though a Hutu law required "a Hutu man married to a Tutsi woman to kill his wife," Mukamusoni's father refused to kill his wife because he was in love with her. But later, a Hutu death squad came to the refugee camp and slaughtered Mukamusoni's mother and her remaining siblings, along with many other refugees.

Through most of the genocide, Mukamusoni was in Uganda. She returned to Rwanda in 1995, when the civil war in Rwanda slowed down, to take the university entrance exams and to be with her family. While in Rwanda preparing for the exams, she received news of the massacre of her mother and siblings. Mukamusoni decided to attend the funeral for her mother, siblings, and other victims of the massacre, even though it was very dangerous for her because of her Hutu heritage and the fact that most of the people there were Tutsi. Mukamusoni testified that at the funeral there were "[s]o

-4-

many people" dead and the bodies were "cut in pieces" and "mixed up" and buried in the same grave yard, such that one "couldn't tell who is who." In fact, Mukamusoni was unable to identify the remains of her youngest sibling.

At the funeral, she also saw her father, who could not stay long because the Tutsi in the RPF were looking for him. (By then the RPF was in control of the government of Rwanda.) He told her that he was leaving Rwanda for Zaire (now Congo) with the other Hutu rebels. According to the 1999 Human Rights Watch Report for Rwanda, after the RPF victory, the Hutu rebels led "some two million Rwandans into exile, more than half of them to Zaire."

Mukamusoni began her studies at the National University of Rwanda in Butare, Rwanda in May 1996. She introduced into evidence a copy of her Rwandan identity card and a copy of her student identity card at the National University of Rwanda. The RPF government posted soldiers, most of whom were Tutsi, at the entrances of the University in order to prevent a repeat of the Hutu rebels' massacre of the students, which had occurred in 1994 during the genocide. The soldiers and other students began to harass Mukamusoni because she was using her father's last name, Mukarazizi, which they recognized as the name of a known Hutu rebel. Mukamusoni studied journalism and was an outspoken proponent of ethnic reconciliation between the Hutu and the Tutsi. In response, the Tutsi soldiers and their student affiliates banned

her from publishing letters in the school newspaper and told other students not to listen to her. She received letters from her father from time to time informing her that he was alive, but these letters were interpreted by the RPF soldiers as evidence of her espionage with a Hutu rebel. As a result, she was "pulled from class" and questioned by the soldiers.

At the end of her first semester, Mukamusoni was again taken from class to the RPF office, where her student ID and Rwandan passport were taken from her so that she could not travel and leave Rwanda. The soldiers interrogated her about her correspondence with her father and his whereabouts; although she showed them her father's letters and explained that she knew nothing about the plans of the rebels, the soldiers did not believe her and thought she was lying. She was arrested and taken to prison in Butare, Rwanda, where she was imprisoned for four months. During this time she was beaten every morning, interrogated twice per week, and tortured by various kinds of forced activity: rolling in dry grass in the mornings as a form of "wake up"; walking "miles and miles" to exhaustion; digging ditches; digging through giant anthills in hot weather to retrieve the queen ant while being beaten until she passed out; and doing other kinds of manual labor. Within the first week of her imprisonment she was raped by a Tutsi soldier at the prison. This was her first experience of sexual intercourse, and she was terrified that she would contract AIDS or

become pregnant from the rape. During her imprisonment, she "wished for death" and "had no hope for the future." But, to her surprise, she was released when the RPF government realized that she had no information about her father. Her passport was returned to her, and she finished her first year at the University in 1997.

In 1997, after her release from prison, she received a letter from someone claiming to be a friend of her father's informing her that her father had been killed by the Tutsi in Kibeho, Zaire. Because the letter was from a Hutu rebel, it was not signed. From that point on, Mukamusoni received no further communications from her father.

According to the 1999 Human Rights Watch Report for Rwanda, "[i]n refugee camps [in Zaire], remnants of the defeated [rebel Hutu] army rearmed, recruited new forces, and began incursions into Rwanda. In 1996, [Tutsi] Rwandan troops . . . dispers[ed] the camps, massacring tens of thousands of unarmed civilians, and killing thousands of soldiers and militia."

In her removal proceedings, the INS lawyer and the IJ both questioned Mukamusoni about whether she could present death certificates for her family. She testified that she "never even heard about . . . death certificates. . . . They don't give out death certificates in [Rwanda]," especially not "during the genocide." Nor did she know if they gave out death certificates in Zaire, where her father had died, as she had never been there.

Mukamusoni spent the summer of 1997 back in Uganda at St. Mary's convent. She told Sister Catherine, a nun to whom she was very close, her fears of returning to Rwanda in light of her experiences there. However, Sister Catherine urged her to return to Rwanda to continue her studies. Because she had lost her entire family and had no means of economic support, Mukamusoni decided that she had to return to school in Rwanda.

When Mukamusoni started her second year at the University in 1997 she changed her last name on the student ID from her father's name (Mukarazizi) to her own (Mukamusoni), in the hope that the RPF soldiers would stop harassing her. Mukamusoni explained that in Africa it was not necessary that children have the same last name as their parents. But, this name change did not work because a fellow student, Ndemezo, found out through Mukamusoni's classmates that she was Hutu and that her father was a Hutu rebel. Ndemezo, a Tutsi, targeted Mukamusoni for harassment because he felt that she helped to kill his family and reported her to his brother, who was a soldier in the RPF. Ndemezo stole Mukamusoni's Ugandan passport. Later in the year, Mukamusoni was again arrested by the RPF and, this time, she spent two months in prison. She was beaten, forced to do manual labor, and raped by a different Tutsi soldier. The RPF again interrogated her concerning her father and her travels to Uganda, believing that she was receiving information from Hutu rebels. She gave the soldiers all

the information they sought, including the address of St. Mary's convent in Uganda. Although she showed the soldiers the letter containing news of her father's death, the RPF continued to believe that her father was alive. The soldiers finally released her after she threatened to kill herself. After she was released, she was punished each day with manual labor tasks that took all day such as farming and cleaning university facilities, such that it was nearly impossible for her to attend class.

After a few weeks of trying to do manual labor and to attend class, Mukamusoni escaped to St. Mary's convent in Uganda. There she was confronted on several occasions by Ugandan and RPF soldiers. Mukamusoni explained that Ugandan soldiers worked with the RPF because Uganda had supported the Tutsi during the civil war. One of Mukamusoni's friends, Fi Fi, informed Sister Catherine that RPF soldiers were planning to arrest Mukamusoni in Uganda. Sister Catherine then took Mukamusoni to a remote village where she could hide while Sister Catherine obtained on Mukamusoni's behalf a Ugandan passport, a tourist visa to the United States, and a plane ticket.

Sister Catherine believed that Mukamusoni should go back to Rwanda to get her college transcripts so that she could continue her studies in the United States. Although Mukamusoni pled with Sister Catherine and explained to Sister Catherine that such a trip would be very dangerous, Sister Catherine insisted that it was very

important. At Sister Catherine's urging, Mukamusoni returned to Rwanda on February 17, 1998, to obtain her transcripts. She heard from Fi Fi that the RPF was planning to arrest her, and she immediately fled back to Uganda ten days later, without her transcripts. Upon her return, she stayed for a short time at the convent before going back to the remote village to hide. While she was at the convent soldiers hid outside the convent, waiting to interrogate her. Mukamusoni also returned to Rwanda one more time in another aborted attempt to get her transcripts, staying for only a few days this time because she again heard that the RPF planned to arrest her. Mukamusoni introduced into evidence a copy of her Ugandan passport.

Mukamusoni returned to the convent at the end of April 1998 to get her plane ticket, and Sister Catherine died of cancer shortly after that. Mukamusoni left Uganda and entered the United States at Houston, Texas, on May 5, 1998 with a six-month visitor's visa. Her luggage was lost by the airline. Many of her personal documents, such as her Rwandan passport and the letter informing her of her father's death, were lost along with the luggage. Mukamusoni introduced into evidence an apology letter from Northwest Airlines and the lost luggage tracing claim forms.

Mukamusoni moved to Waltham, Massachusetts, where she lived with a distant relative and worked as a babysitter. On May

10, 1999, she applied for asylum in the United States, a few days more than one year after she entered the United States.[2]

In August of 1999, Dr. Rachel Wolfe, a psychologist of the Cambridge Health Alliance, began to evaluate Mukamusoni, upon referral by Mukamusoni's counsel. Dr. Wolfe conducted three clinical interviews with Mukamusoni and recorded her findings in a psychological evaluation completed on October 1, 1999. This evaluation and a set of notes maintained by Dr. Wolfe during the time she saw Mukamusoni were submitted into evidence. Dr. Wolfe found Mukamusoni to be a "reliable historian" whose "account of her experience was consistent across interviews." Dr. Wolfe wrote that Mukamusoni suffered from ulcers "developed in prison," and that she sought HIV testing to be sure that she did not have AIDS. Dr. Wolfe reported that every night, Mukamusoni experienced nightmares of her tortures in prison and the killings of her family, waking to the "sound of her own screams or to a pillow wet with her tears." She wrote that Mukamusoni "fe[lt] flooded with terror," "experienc[ed] overwhelming grief . . . and feelings of helplessness and hopelessness," "felt cut off from people," and had little control over her crying spells. Dr. Wolfe described Mukamusoni as having a restricted range of emotion, which she said is typical of trauma victims, and that Mukamusoni had a "sense of

---

[2] An application for asylum must be filed within one year unless excused by changed or extraordinary circumstances. 8 U.S.C. §§ 1158(a)(2)(B), (D).

-11-

foreshortened future" where she did not "expect to live long." Dr. Wolfe also wrote that Mukamusoni had difficulty falling and remaining asleep at night, "unable to get thoughts of her family and fears of what will happen to her out of her mind."

Based on Mukamusoni's symptoms, Dr. Wolfe diagnosed her with Post Traumatic Stress Disorder (PTSD). Beyond the diagnosis of PTSD, Dr. Wolfe reported that Mukamusoni's behavior during her interviews (including low voice and low level of energy) was typical of individuals experiencing a "Major Depressive Disorder" under the definition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. Dr. Wolfe recommended that Mukamusoni receive "individual psychotherapy and psychopharmacology," and "antidepressant medication for her post-traumatic and depressive symptoms." Mukamusoni began to receive psychotherapy from Dr. Wolfe, and she was also given Prozac. Dr. Wolfe noted that Mukamusoni "appear[ed] to have the drive and intelligence to create a productive life for herself in the United States." Dr. Wolfe noted that Mukamusoni was "enthusiastic and compliant" in treatment, but was not reliable in making her appointments. After a few more sessions, Mukamusoni did not continue to see Dr. Wolfe for treatment.

The INS rejected Mukamusoni's application on October 15, 1999, because she missed the one-year filing deadline. See 8 U.S.C. § 1158(a)(2)(B); 8 C.F.R. § 1208.4(a). On October 27, 1999,

-12-

the INS issued a Notice to Appear, charging her with removability as an alien who remained in the United States longer than permitted.

## II.

Removal proceedings for Mukamusoni commenced before an IJ on January 12, 2000; Mukamusoni conceded removability and relied on her application for asylum, withholding of removal, protection under the CAT, and voluntary departure. A merits hearing was held on April 27, 2000, and continued on January 24, 2001.

During the April 27, 2000 hearing, the IJ excused Mukamusoni's late filing of her asylum application because the IJ found her to be suffering from PTSD during the year that she was in the United States, and that this constituted "extraordinary circumstances" justifying the late filing. No dispute remains as to the timeliness of her filing.

Mukamusoni testified to the events in her application and affidavit as recounted above. She testified that she was afraid to go back either to Uganda or Rwanda for fear that she would be tortured due to her Hutu ethnicity and the political activities of her father. She testified that she had heard from her friend Fi Fi that soldiers still went by St. Mary's to ask the nuns about Mukamusoni's whereabouts.

Mukamusoni offered to have Dr. Wolfe testify at the original hearing on April 27, 2000, but was told by the IJ to wait

for a later date as the IJ wanted to hear Mukamusoni's testimony first. Mukamusoni again offered to have Dr. Wolfe testify by telephone at the January 24, 2001 hearing, but the IJ denied that request as well on the ground that the witness was available. Dr. Wolfe, however, was not available to appear for the later date and so did not testify.

At the April 27, 2000 hearing, the IJ granted a continuance to January 24, 2001 in part to allow Mukamusoni to obtain additional documentation, including a death certificate for her father, medical records, and a letter from her friend Fi Fi. At the later date, Mukamusoni submitted her medical records into evidence. The government objected on the ground that Dr. Wolfe, the maker of the records, was not available to be cross-examined. The IJ nonetheless made the records part of the record, agreeing to consider them de bene in light of the objection. The IJ also denied Mukamusoni's attempt to introduce an affidavit documenting the (ultimately unsuccessful) attempts to secure a death certificate for her father.

The IJ finally denied Mukamusoni's application for asylum "as a matter of discretion" in an oral decision dated January 24, 2001. The IJ also denied the applications for withholding of removal and CAT protection but granted her voluntary departure.

The IJ found that Mukamusoni "has not established the truthfulness of what is stated in her asylum application,

-14-

documentation in support thereof, and her testimony in these proceedings." That was because, in the IJ's view, "[a] reasonable person, similarly situated as [Mukamusoni] on this record would not fear persecution or have a well-founded fear of persecution on account of [one of the five statutory grounds listed in 8 U.S.C. § 1101(a)(42)(A)]." The IJ found that Mukamusoni's testimony was "self-serving" and "[left] a lot to the imagination" and determined that she gave "no evidence" and "no corroboration" concerning her experiences.

On appeal to the BIA, Mukamusoni argued that the IJ had failed to give her the benefit of the regulatory presumption of a well-founded fear of future persecution for establishing past persecution. See 8 C.F.R. § 1208.13(b)(1). She also argued that the IJ misapplied the "reasonable person" test set out in Matter of Mogharrabi, 19 I. & N. Dec. 439, 445 (BIA 1987). Finally, she argued that the IJ abused his discretion by failing to consider her case fully, and in particular, the IJ offered no substantive basis for his adverse credibility findings.

On April 22, 2003, the BIA denied her appeal. In its decision, the BIA found it unnecessary to address the adverse credibility findings of the IJ and implicitly accepted that Mukamusoni was credible.[3] It nonetheless found Mukamusoni "failed

_____

[3] The government explicitly adopted the position that the BIA treated Mukamusoni's testimony as credible during oral argument.

-15-

to meet her burden of proof in establishing past persecution or a well-founded fear of future persecution." Even though the BIA proceeded on the assumption that Mukamusoni was credible, it found her testimony to be "vague regarding key elements of her asylum claim" and "scant and generalized." For example, the BIA found it significant that Mukamusoni "testified that she was raped during her incarcerations, but provided no details about the incidents." It discussed Dr. Wolfe's psychological evaluation only in the sense of holding it against Mukamusoni because she did not continue to appear for treatment. The BIA also found that Mukamusoni did not provide sufficient corroborating evidence to support her claim, and that such corroboration was necessary because her testimony was not "sufficiently detailed." Finally, the BIA determined that Mukamusoni's decision to return to school in Rwanda after her first arrest and to return to Rwanda on two occasions to retrieve her college transcripts undercut the genuineness of her subjective fear.

On May 20, 2003, Mukamusoni timely petitioned this court for review of the BIA's decision to affirm the IJ's decision.

## III.

It is the BIA's decision, as the final agency order, that we review. See Georcely v. Ashcroft, 375 F.3d 45, 49 (1st Cir. 2004); Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003). We review the BIA's determination that Mukamusoni failed to meet her

-16-

burden of proof under the deferential substantial evidence standard. INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992); Albathani, 318 F.3d at 372. Our review is on the whole record, not solely on the evidence that supports the BIA's determination. Gailius v. INS, 147 F.3d 34, 44 (1st Cir. 1998). "[D]eference is not due [to the BIA] where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole, or are merely personal views of the immigration judge." Cordero-Trejo v. INS, 40 F.3d 482, 487 (1st Cir. 1994) (citations omitted). "[W]e may not affirm the BIA's decision 'when we cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.'" Gailius, 147 F.3d at 44 (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)) (alteration omitted). The BIA's legal conclusions are reviewed de novo, "with appropriate deference to the agency's interpretation of the underlying statute in accordance with administrative law principles." Id. at 43.

An asylum applicant bears the burden of proving that he or she is "unable or unwilling to return to [the applicant's country of nationality] . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political

opinion." 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(a). Applicants may meet this burden in one of two ways: 1) by demonstrating a well-founded fear of persecution on account of one of the statutory grounds, or 2) by establishing past persecution on account of one of the statutory grounds so as to be entitled to a presumption of a well-founded fear of persecution. Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004); 8 C.F.R. § 1208.13(b).

Once an applicant has been found to be entitled to the benefit of such a regulatory presumption based on past persecution, the presumption may be rebutted by a finding that either "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country." El Moraghy v. Ashcroft, 331 F.3d 195, 203 (1st Cir. 2003) (quoting 8 C.F.R. §§ 1208.13(b)(1)(i)(A)-(B)) (alterations in original). The government bears the burden of rebutting the presumption by a preponderance of the evidence. 8 C.F.R. § 1208.13(b)(1)(ii).

An applicant must pass both an objective and subjective test to show a well-founded fear of future persecution. El Moraghy, 331 F.3d at 203; Velasquez v. Ashcroft, 342 F.3d 55, 58-59 (1st Cir. 2003). The subjective test requires the applicant to prove his fear is genuine, while the objective test requires

-18-

showing by credible and specific evidence that this fear is reasonable.  El Moraghy, 331 F.3d at 203.

We conclude on this record, taking Mukamusoni as credible as the BIA did, that substantial evidence does not support the BIA's conclusion that Mukamusoni failed to establish past persecution on account of her mixed Hutu/Tutsi heritage and/or the political activities of her father.  The BIA committed errors of law and misapplied the law by focusing narrowly on only parts of the record that supported its decision, by raising too high the bar for an asylum claimant seeking to prove past persecution or a well-founded fear of future persecution, by unreasonably evaluating the record, and by excessively demanding corroborative evidence.  We explain these errors below.

If the BIA had squarely found her credible, then on this record, it is very likely that we would have been compelled to conclude that Mukamusoni had established past persecution with respect to her testimony of the events in Rwanda.[4]  See, e.g., Knezevic v. Ashcroft, 367 F.3d 1206, 1212 (9th Cir. 2004)

---

[4]  Although the BIA's decision begins by noting that Mukamusoni is a "native and citizen of Uganda" who, on appeal, claims that she "established past persecution . . . in Uganda," the decision then goes on to discuss exclusively her testimony of events in Rwanda and persecution by the Rwandan government.  The BIA treated Mukamusoni's nationality as Rwandan for asylum purposes, and we will frame our review accordingly.  "'[A] reviewing court must judge the propriety of administrative action solely by the grounds invoked by the agency . . . .'"  Gailius, 147 F.3d at 44 (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)) (alterations omitted).

-19-

(reversing BIA's finding that there was no past persecution and holding that record compels conclusion that asylum applicants suffered past persecution); Bellido v. Ashcroft, 367 F.3d 840, 846 (8th Cir. 2004) (same).  In that event, she would have been entitled to a regulatory presumption of having met her burden of proof with respect to fear of future persecution, and we would remand for further proceedings on the basis that she had met that burden.  However, since the BIA declined to reach the adverse credibility findings of the IJ but assumed credibility, we vacate the BIA's order and remand for further proceedings in light of this opinion.

The record and Mukamusoni's burden of proof

Because the BIA "d[id] not find it necessary to address [Mukamusoni's] credibility" and solely evaluated the sufficiency of the evidence to meet Mukamusoni's burden of proof, the BIA treated her testimony and her supporting documentation as credible.  That is also the position the government has taken in this court.

The BIA nonetheless affirmed the IJ's denial of asylum because it found that Mukamusoni "ha[d] not presented sufficient detail so as to provide a plausible and coherent account of the events underlying her claim" and "failed to meet her burden of proof in establishing past persecution."  To support this conclusion, the BIA explained that "[w]hile [Mukamusoni]'s affidavit was replete with information, her testimony was scant and

-20-

generalized."  Then, while citing and purporting to follow the analysis in Matter of Y-B-, 21 I. & N. Dec. 1136 (BIA 1998), the BIA focused exclusively on Mukamusoni's oral testimony.  The BIA painted Mukamusoni's oral testimony regarding the circumstances of her two arrests, incarceration, and release as "general," "devoid of information," and "vague[]."  In particular, the BIA pointed to the fact that Mukamusoni provided "no details" about her rapes.  The BIA concluded that Mukamusoni, like the applicant in Matter of Y-B-, "did not offer critical details in her testimony to furnish context to her claim for asylum."  See Matter of Y-B-, 21 I. & N. Dec. at 1137-38.  The record does not support any of these conclusions.

The BIA's focus on only the oral evidence was error in two ways.  First, as a matter of fact, Mukamusoni had been encouraged to keep her oral testimony short because her extensive affidavit was accepted as the bulk of her testimony; and so the affidavit could not be discounted.  Further, as a matter of law, under INS rules, that affidavit testimony could not be discounted to the extent the BIA chose to do.  See 8 C.F.R. § 1208.3(c)(1) ("[I]nformation provided in the [asylum] application may be used . . . to satisfy any burden of proof in . . . removal proceedings.").  In doing so the BIA committed an error of law.

The BIA also erred in applying its own precedents.  Nothing in Matter of Y-B- supports the BIA's reasoning.  In Matter

-21-

of Y-B-, the BIA affirmed the IJ's decision to deny a Mauritanian man's claim for asylum on the ground that the alien failed to meet his burden of proof to establish eligibility for asylum. 21 I. & N. Dec. at 1136-39. The BIA relied on the fact that the alien's application for asylum "[did] not provide additional information regarding his claim. Rather, there [were] significant omissions [of references to events he orally testified to] in the written application." Id. at 1138 (emphasis added).

In contrast to Matter of Y-B-, the written affidavit of Mukamusoni in support of her asylum application is "replete with information." Every single item that the BIA found lacking sufficient detail in Mukamusoni's oral testimony is supplemented by additional detail in her written answers to the asylum application and the affidavit in support of her application. For example, the BIA faulted Mukamusoni for giving only "general" oral testimony about the "date or location" of her arrests, the manner of her arrests, and details concerning her incarceration, interrogation, and release. Yet, all of these details are found in her affidavit and written answers on the asylum application, which are part of the record before the BIA.[5] The BIA identified no instance where

_____

[5]  In some instances, the BIA's finding that Mukamusoni provided insufficient detail is simply not supported even on the basis of the oral testimony alone. For example, the BIA stated that Mukamusoni "testified that she was raped during her incarcerations, but provided no details about the incidents." (emphasis added). To the contrary, the transcript of the oral proceedings before the IJ reveals the following testimony from Mukamusoni:

-22-

she testified to significant events that are omitted in the written application and affidavit.  Thus, the analysis in <u>Matter of Y-B-</u> does not support the BIA's conclusion.

The BIA's failure to take into account the evidence in Mukamusoni's application and affidavit is contrary to law and particularly egregious in light of the IJ's limitation of oral testimony.  We also note that the government did not object to the admission of the affidavit information into evidence and had ample opportunity throughout the proceedings to cross examine her on the details in the affidavit.

<u>Lack of corroboration</u>

The BIA also found that Mukamusoni "did not provide sufficient corroborating evidence to support her claim."  This finding is likewise not supported by substantial evidence.

Initially, the BIA's finding of lack of corroborative evidence is linked to its error in not reviewing the entire record, as noted above.  This is so because "corroborative evidence is not

_____

> They took me to prison. . . . And then after that there was a, there was a soldier who was like I can take her to help me, to help me in my house.  And another woman was no, she can't help you, she can stay here.  Then when they refused for him to take me, he raped me.

Mukamusoni also testified that a different soldier raped her during her second incarceration.  At oral argument, the government was unable to explain what additional "details" concerning the rapes might be relevant.

-23-

required to establish an asylum claim; in many cases, the applicant's own credible testimony is sufficient to support eligibility for asylum as long as it provides a basis for a well founded fear."  Gailius, 147 F.3d at 45; see also 8 C.F.R. § 1208.13(a).  The BIA has also held that "the weaker an alien's testimony [is], the greater the need for corroborative evidence."  Matter of Y-B-, 21 I. & N. Dec. at 1139.  Because the BIA failed to consider the entire record and found Mukamusoni's testimony weaker than it actually was, it demanded a higher level of corroboration than it should have.  The "combination of detailed testimony and corroborative background evidence" is sufficient to establish Mukamusoni's past persecution.  Id.

In any event, the record does not support the BIA's conclusion that Mukamusoni insufficiently corroborated her testimony.  The BIA ignored the presence of the bulk of the corroborative evidence in the record and overstated the role of the absence of certain pieces of corroborative evidence.  In support of her application for asylum, Mukamusoni offered corroborative evidence in the form of medical records, country condition reports, proof of the loss of certain documents from Northwest Airlines, and identification documents.  In addition, Mukamusoni offered to provide an affidavit explaining why she could not obtain a copy of her father's death certificate.

First, the overwhelming weight of the evidence from the twenty-five pages of Dr. Wolfe's notes and Dr. Wolfe's psychological evaluation corroborates Mukamusoni's claims. The records are literally replete with information which supports the substance of Mukamusoni's testimony. Mukamusoni's account of her experiences in Rwanda to Dr. Wolfe is also consistent with the accounts given in her affidavit, application, and oral testimony. Dr. Wolfe noted the physical evidence that corroborated Mukamusoni's story: ulcers developed in prison, her independently sought HIV testing in light of her fear of having contracted AIDS from her rapes, trauma-induced PTSD symptoms such as nightmares, hopelessness, sleeplessness, distrust of others, etc.[6]

The BIA, however, found that the medical records Mukamusoni submitted to bolster her claim actually "undercut[] her claim" that she suffers from PTSD because the records show that Mukamusoni "was not sincere in her attempts to seek medical assistance." The BIA based this conclusion on the following handwritten note from Dr. Wolfe: "[Although enthusiastic and compliant,] [Mukamusoni] was not reliable in coming to therapy and, after 2 sessions beyond the asylum eval. indicated that she did not

---

[6] At the end of her evaluation, Dr. Wolfe wrote that Mukamusoni "plan[ned] to resume her journalism studies and ha[d] begun taking some courses at Middlesex Community College," which corroborates Mukamusoni's account of her journalism studies at the National University of Rwanda and Sister Catherine's hope that she resume her studies in the United States.

-25-

have time to come. She recontacted me in early March 2000 because her final trial was coming up soon."[7] Even if the BIA were correct that this indicated Mukamusoni's lack of dedication in seeking medical treatment, it is not clear how this would "undercut her claim" with respect to her PTSD condition. The medical records were submitted to corroborate the diagnosis of her treating psychologist and the strength of her fear, which are facts independent of her ability to keep appointments. To the extent that her "sincerity" in seeking treatment might be relevant to a general credibility determination, the BIA already chose not to address her credibility.

The BIA's interpretation of the medical records is especially inexplicable because, within the very same note from which the BIA takes the quote above, Dr. Wolfe <u>reiterates</u> her diagnosis and recommends continued follow-up treatment for Mukamusoni with a new therapist, which would be a nonsensical conclusion if Dr. Wolfe thought Mukamusoni's PTSD to be fabricated. Viewed as a whole, the BIA's finding that the medical records "undercut[]" rather than corroborated Mukamusoni's claim is simply unsupportable.

---

[7] The first bracketed portion is present in the doctor's note but omitted by the BIA in its quotation. The word "eval." (presumably the abbreviated form of "evaluation") is misquoted as "level" in the BIA decision.

The BIA also cited the fact that "[n]otwithstanding the long continuance, [Mukamusoni] did not present [Dr. Wolfe] as a witness, as she was unavailable" as further example of lack of corroboration. This is not a fair or accurate characterization of the history of the proceedings before the IJ. The record shows that Mukamusoni made repeated offers to have Dr. Wolfe testify, first in person, and then telephonically, but was not allowed to do so by the IJ. The record also shows that the "long continuance" was not granted by the IJ in order to have Mukamusoni secure Dr. Wolfe's testimony.

There are other pieces of corroborative evidence in the record that the BIA did not discuss and it is unclear whether the BIA even considered them: the letter from Northwest Airlines and lost luggage tracing claim forms confirming her lost luggage, her Ugandan passport, her Rwandan identity card, and her student identity card at Rwandan National University. Each of these documents provided corroboration for crucial parts of Mukamusoni's story. For example, the Ugandan passport corroborated her testimony as the IJ asked her about her flight between Uganda and Rwanda.

The BIA also made no mention of the background and country conditions evidence that Mukamusoni submitted into the record. In reviewing an applicant's claim of credible fear of persecution, current regulations state that "the asylum officer may

rely on material provided by the Department of State . . . or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions." 8 C.F.R. § 1208.12. Mukamusoni submitted into evidence the 1999 country conditions reports on Rwanda from Human Rights Watch, Amnesty International, and the Department of State. Courts and the BIA routinely used such country condition reports to corroborate the testimony of asylum applicants under the old regulations.[8] See El Moraghy, 331 F.3d at 203-04 (country condition reports "can either help or harm a petitioner's case, depending on whether or not they corroborate the petitioner's tale"); see also Cordero-Trejo, 40 F.3d at 490-91 (incidents of politically, socially or religiously motivated persecution of non-prominent individuals in applicant's position in his country of nationality bolstered alien's claim). It was error for the BIA to have ignored the country condition reports because "this failure [to evaluate the reports] unreasonably eviscerate[d] the applicant's attempt to establish the objective element of her asylum claim." Cordero-Trejo, 40 F.3d at 492.

---

[8] The old regulations made it clear that credibility should be judged "in light of general conditions in the applicant's country of nationality or last habitual residence." El Moraghy, 331 F.3d at 203. Although the issue before us is not an agency's determination of credibility, the country condition reports could still be used to provide corroboration and support the applicant's claims. See id. at 204.

Such documentary evidence is "extremely important for contextualizing, in the absence of direct corroboration, the events which [an applicant] claims constitute persecution." Id. at 491. Even a quick look at the country condition reports demonstrates that these reports support Mukamusoni's claims. See Gailius, 147 F.3d at 45 n.6 ("[A]n uncorroborated story that is at odds with what is known about country conditions is less likely to be accurate than one that is consistent with country conditions."). For example, the country reports corroborate Mukamusoni's account of persons in her father's position joining the Hutu rebels in Zaire and their subsequent deaths in the Kibeho camp. In addition, the 1999 Human Rights Watch Report for Rwanda contains descriptions of the practices of arbitrary detentions, prison abuses, and military-civilian security sweeps carried out by the RPF government which corroborate Mukamusoni's testimony of her experiences in Rwanda: "The government, citing the need for self-defense against the insurgency, organized civilians to monitor purportedly anti-government activity . . . ." "Military, police, and some civilian officials took thousands of persons into custody during large-scale security sweeps, residential inspections, and verification of identify papers on the roads. Some of these persons were subsequently released after interrogation that was sometimes accompanied by physical abuse." The BIA unreasonably ignored these reports, and gave no explanation for why it did so.

-29-

Not only did the BIA err in not adequately considering the medical records and country condition reports as corroborative of Mukamusoni's testimony, it also overstated the role of the absence of certain pieces of corroborative evidence. The BIA placed unreasonable weight on the absence of a letter from Mukamusoni's friend Fi Fi corroborating Mukamusoni's claims. Mukamusoni originally indicated to the IJ at the April 27, 2000 hearing that she could obtain such a letter. At the January 24, 2001 hearing, neither the IJ nor the parties brought up the letter and it is unclear why (it appears that the IJ may not have included the request for the letter in his notes of the previous hearing). Mukamusoni did not offer an explanation for this absence before the IJ and has not offered one on appeal.[9] It is true that the absence

_____

[9] Mukamusoni's brief claims that her counsel offered to introduce into evidence an affidavit that would have explained the efforts made to obtain these "documents" and why the efforts failed (the death certificate of Mukamusoni's father and the letter from Fi Fi). This is not consistent with the transcript of the hearing, which indicates that Mukamusoni's counsel only offered to explain the absence of the death certificate, but not the letter.

The BIA did not discuss the absence of her father's death certificate and it is unclear whether that played a role in the BIA's finding that Mukamusoni did not submit sufficient corroboration. We note in passing that the absence of her father's death certificate is not particularly probative. "Persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." Bolanos-Hernandez v. INS, 767 F.2d 1277, 1285 (9th Cir. 1984). It does not appear likely that death certificates would be available for the many individuals who died during the Rwandan genocide, and Mukamusoni offered to document the efforts expended to obtain a death certificate for her father (if any existed) but that evidence was excluded by the IJ.

of this letter and any explanation for why it could not be obtained, when Mukamusoni indicated that it would be available, could tend to support the BIA's finding that Mukamusoni did not produce sufficient corroboration. However, the absence of this one letter is insufficient to justify disregarding the corroborative evidence that Mukamusoni did provide. On this record, the BIA's finding that Mukamusoni failed to introduce sufficient corroborative evidence for her asylum claim is not supported by substantial evidence. See Albathani, 318 F.3d at 372.

Mukamusoni's subjective fear

Finally, the BIA questioned the "genuineness" of Mukamusoni's "subjective fear of persecution" in Rwanda because of her "decision to remain at the school after two arrests and to return to Rwanda on two occasions after the Rwandan government was searching for her." This conclusion is again not supported by substantial evidence in the record.

First, the conclusion is in error as a matter of law because we find Mukamusoni, if credible, has met her burden of proof with respect to past persecution in Rwanda, and thus the BIA erred as a matter of law by denying her the benefit of the regulatory presumption under 8 C.F.R. § 1208.13(b)(1).

Second, the BIA's doubts of the "genuineness" of Mukamusoni's subjective fear are contrary to the BIA's decision not to address her credibility.

-31-

Third, the BIA also does not consider the evidence outlined above.  In the context of that evidence, the BIA's assessment does not take into account the reasonable explanations Mukamusoni offered for her decisions to remain at school in Rwanda after her first year and to return to Rwanda to obtain her transcripts despite the danger of being arrested again. Mukamusoni specifically explained that after her first rape, she returned to St. Mary's and was fearful of returning to Rwanda.  However, because the rape was so "ashaming and embarrassing" to her, she did not tell Sister Catherine about the rape.  It is in these circumstances that Sister Catherine then urged her to return to Rwanda and continue her studies, allaying Mukamusoni's fears by assuring her that the RPF soldiers would not arrest her again now that her father was dead.  Mukamusoni was a twenty-year old first-year college student at the time and Sister Catherine was her guiding light.  The assurances by Sister Catherine, as events unfolded, turned out to be tragically overly optimistic.  The decision to remain in a country in which the applicant was persecuted after release from prison does not necessarily undercut an applicant's claim for asylum, if adequately explained. See, e.g., Turcios v. INS, 821 F.2d 1396, 1401-02 (9th Cir. 1987) (finding that it was unreasonable for the IJ to determine that the government of the alien's country of origin would not have persecuted him because the alien remained in that country for

several months after his release from prison when he was under constant surveillance).

Moreover, Mukamusoni testified that after the death of every member of her immediate family, she was without any means of economic or emotional support excepting the generosity of Sister Catherine. She testified in essence that there was literally nothing for her to do in Uganda or Rwanda; her only means of obtaining an education was at the National University of Rwanda, where Rwandans are entitled to education at the government's expense. A decision she made to go back to the only place where she could obtain a "free" education, at Sister Catherine's urging, is insufficient to show, against this record, that her fears of persecution in Rwanda were not genuine. Faced with no viable means of support otherwise, people take risks in the face of their fears. Mukamusoni's subsequent entries into Rwanda to obtain her transcripts were also motivated by both Sister Catherine's urging and Mukamusoni's desperate attempt to preserve the possibility of a better life through the hope of obtaining an education.[10]

Viewing the record as a whole, including the evidence the BIA ignored and assuming Mukamusoni's credibility as did the BIA, we cannot conscientiously find that the evidence supporting the

---

[10] There was discussion in the BIA's opinion about Mukamusoni's travels between Uganda and Rwanda, but the BIA's emphasis was on her returns to Rwanda.

-33-

BIA's determination that Mukamusoni failed to meet her burden of proof is substantial.  See <u>Universal Camera Corp.</u>, 340 U.S. at 488.

**IV.**

The order of the BIA is **<u>vacated</u>** and the case **<u>remanded</u>** for further proceedings not inconsistent with this opinion.