# United States Court of Appeals
## For the First Circuit

No. 17-1518

NIGEL HOPETON MORRIS,

Petitioner,

v.

JEFFERSON B. SESSIONS, III,
ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Lipez and Barron, <u>Circuit Judges</u>.

Ilana Etkin Greenstein, with whom Macias & Greenstein, LLC, was on brief for petitioner.
Gregory A. Pennington, Jr., with whom Chad A. Readler, Acting Assistant Attorney General, Civil Division, Carl H. McIntyre, Assistant Director, and Brooke M. Maurer, Trial Attorney, Office of Immigration Litigation, Civil Division, were on brief for respondent.

May 30, 2018

BARRON, **Circuit Judge**.  This case concerns Nigel Hopeton Morris' petition for review of a decision by the Board of Immigration Appeals ["BIA"] to deny his application for deferral of removal based on the protection to which he claims to be entitled under the United Nations Convention Against Torture ["CAT"].  We deny the petition.

**I.**

Morris came to the United States in 1999 from his country of birth, Jamaica.  While in this country, he became a lawful permanent resident and lived in Massachusetts, though he visited his family in Jamaica several times over the years.  In 2013, Morris was convicted in Massachusetts state court of the following state law offenses: indecent assault and battery on a person 14 years old or older, assault to rape, and assault and battery.  He was sentenced to a term of incarceration of five years.[1]

In 2016, the Department of Homeland Security initiated removal proceedings against Morris on the ground that he was removable under 8 U.S.C. § 1182(a)(2)(A)(i)(I), which provides that "any alien convicted of . . . a crime involving moral turpitude . . . is inadmissible."  Morris did not dispute that his Massachusetts convictions were for crimes of "moral

---

[1] Though Morris does not dispute the fact of his convictions, he also notes that in July 2016, the New England Innocence Project filed a motion for a new trial on his behalf in state court in Massachusetts.

turpitude."   The Immigration Judge ("IJ") thus concluded that Morris was removable under § 1182(a)(2)(A)(i), and was ineligible for asylum or withholding of removal.   Nevertheless, Morris contended at his removal proceedings that, pursuant to 8 C.F.R. § 1208.17, he was "eligible . . . for deferral of removal under the Convention Against Torture [CAT]" based on the fact that a gang leader in Jamaica -- with ties to the Jamaican Constabulary Force (the Jamaican police) ("JCF") -- had threatened to kill him for being an informant.

The Immigration and Naturalization Service promulgated § 1208.17 in March of 1999 apparently in order to implement the Foreign Affairs Reform and Restructuring Act ("FARRA").   Congress enacted FARRA in 1998 to comply with the CAT.   See Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, Div. G., Title XXII, 112 Stat. 2681-822.

The CAT requires, among other things, that "[n]o state . . . expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, art. 3, § 1. Consistent with the United States' obligation under the CAT, 8 C.F.R § 1208.17 provides that an alien who

has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

8 C.F.R. § 1208.17(a). The regulation further provides that to be entitled to deferral of removal an alien must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

The regulation defines torture as

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). The government does not dispute Morris' contention that the harm that he contends that he would face in Jamaica from the gang leader would qualify as torture.

The IJ denied Morris' claim for deferral of removal, and the BIA affirmed the IJ's ruling. Morris now petitions for review.

## II.

The government argues that we lack jurisdiction over Morris' petition. The government relies on 8 U.S.C. § 1252(a)(2)(C), which provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a [qualifying] criminal offense."

Morris does not dispute that he was convicted of a qualifying offense. He nevertheless contends that we may consider his petition. He does so in part based on the exception in 8 U.S.C. § 1252(a)(2)(D) that states that:

> [n]othing in subparagraph (B) or (C), or in any other provision of this chapter (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

We thus begin with Morris' contention that he is bringing a challenge that this exception encompasses. We then consider his separate challenge, which he acknowledges does not allege that either the IJ or the BIA made an error of law. He contends that we may review it nonetheless because the jurisdictional bar simply does not apply at all to an order denying an alien's claim for deferral of removal.

**A.**

Morris rightly contends that his challenge to the order denying his deferral of removal claim falls within the exception to the jurisdictional bar insofar as it is "legal in nature." And he argues that at least part of his challenge is "legal in nature" because he is contending that the agency mischaracterized the record and misapplied the relevant law to undisputed facts. In so arguing, Morris relies principally on Mukamusoni v. Ashcroft, 390 F.3d 110 (1st Cir. 2004), in which we held that the BIA in that case "committed errors of law and misapplied the law by focusing narrowly on only parts of the record that supported its decision." Id. at 120.

To assess Morris' contention, we first describe the evidence that Morris submitted in support of his deferral of removal claim in the proceedings before the IJ. We then describe the rulings by the IJ and the BIA denying his claim for deferral of removal. Finally, we explain why Morris' challenge to those rulings under the exception to the jurisdictional bar fails.

**1.**

At the removal proceedings, Morris, through his own testimony and declaration, offered the following account of why he believed that he would be tortured if he were removed to Jamaica. His older brother, Wayne Morris, was a member of a drug trafficking organization called the "British Link-Up Crew" that operated in

Jamaica but was based in the United Kingdom. Wayne was closely associated with the organization's leader, Owen Clarke.

On several occasions, Clarke and Wayne accused each other of being informants. Fearing retribution by Clarke, who is wealthy and had "connections in the Jamaican police force," Wayne hired his nephew to be his bodyguard. The nephew was murdered in 2011, and no one was arrested for the crime.

At some point after Wayne's nephew was killed, Morris traveled to Jamaica from Massachusetts. While in Jamaica on December 27, 2011, Morris encountered Clarke who "confronted" him and said: "All [indiscernible] informer for dead." Morris testified before the IJ that, via this encounter, Clarke was "trying to tell me . . . that me and my brother are to die, and he was making it known that I deliver the message to my brother."

Morris also described this encounter in his declaration. There, he stated that Clarke had "pulled up next to my car" and "made threatening comments to me." Specifically, Morris stated in his declaration that "[Clarke] said that my brother was an informer and through my relationship with my brother, that made me an informer and that informers did not deserve to live." Morris added that he told his brother what Clarke did that afternoon "but [his brother] dismissed it."

In 2015, Wayne was "murdered by two gunmen" in Kingston, Jamaica. No arrest was made. Morris stated in his declaration

- 7 -

that his brother was murdered by "people associated with Owen Clarke" and that "Owen Clarke is protected by corrupt authorities."

In addition to this evidence concerning the likelihood that Clarke would target him, Morris also provided evidence to support his contention that the harm that he feared from Clarke would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). That evidence included both documents and expert testimony.

Specifically, Morris introduced several human rights reports and newspaper articles on gang violence in Jamaica that addressed connections between organized crime and the JCF. Morris also provided the testimony of an expert, Anthony Harriott, who was a professor and the director of the Institute of Criminal Justice and Security at the University of the West Indies in Kingston. Harriott testified about the likelihood that Clarke would contract with the JCF to exact retribution against Morris.

**2.**

The IJ rejected Morris' claim for deferral of removal. In doing so, the IJ made a number of findings. Some pertained to the issue of whether Morris had met his burden to show that it was more likely than not that Clarke would target him if Morris were to return to Jamaica. The IJ found that Morris had not met his burden in that regard because it was not clear from the record

that Morris "would even be known by [Clarke]" and that it was also unclear whether Clarke possessed the connections to "orchestrate" Morris' murder.

Other findings by the IJ pertained to whether Morris had met his burden to show that it was more likely than not that, insofar as the record showed that Clarke would target Morris, Clarke would do so with the involvement (direct or indirect) of the JCF. For example, the IJ determined that Harriott's testimony concerning the likelihood that Clarke would use (directly or indirectly) the JCF in targeting Morris for harm was speculative.

For example, the IJ found that Harriott, whom the IJ accepted as an expert in the field of criminology or criminal justice in Jamaica and found to be credible, was of the view that "[Clarke's] role is such that he probably has some contacts remaining in the police force, and he may 'possibly' use them as contacts against the respondent." (emphasis added). The IJ went on to conclude that Harriott "could only speculate as to what Owen Clarke would do or whether he would outsource any murder or murder for hire to the police, or another organization, or keep it in-house."

After Morris appealed the IJ's ruling, the BIA affirmed. The BIA did so on the ground that the IJ did not clearly err as to its "interpretation of the expert witness's testimony regarding contracting relationships between the drug trafficking

organization and corrupt police officers, and inferences regarding the likely resources available to the brother's former associate."

**3.**

To decide whether there is merit to Morris' challenge, insofar as it relies on the exception to the jurisdictional bar, it is important to keep in mind what he must show to demonstrate that he is entitled to deferral of removal. Morris must show not simply that it is more likely than not that Clarke would target him if he were removed to Jamaica. Morris also must show that it is more likely than not that the harm that he claims that he will suffer in consequence of Clarke targeting him will be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Thus, in order to make a successful challenge pursuant to the exception to the jurisdictional bar, Morris must show that the IJ (or the BIA) made an error of law with respect to each of these two issues. And because he does not make that showing with respect to the latter of these two issues, we need not address his challenge to the portion of the IJ's decision that concerns the former.

With respect to that portion of the IJ's ruling that concerns the likelihood that Clarke would involve the JCF, Morris contends that the IJ made an error of law in the following way. Morris argues that the IJ ignored the documentary evidence that

Morris put forth about gang violence in Jamaica and how the Jamaican government addresses it and mistakenly considered only Harriott's testimony. And, Morris argues, the IJ ignored this other evidence, despite its clear relevance, only because the IJ misapprehended the actual argument that Morris was making as to why it was likely that Clarke would target him at all. In consequence, Morris contends that the IJ made an error of law that deprived Morris of his constitutional right under the Fifth Amendment to procedural due process.

We may assume that Morris is right that, in light of Mukamusoni, a failure by an immigration judge to consider a relevant part of the record based on a misapprehension of the nature of the petitioner's argument constitutes an error of law for purposes of the exception to the jurisdictional bar. Mukamusoni, 390 F.3d at 120. But, even if that is the case, we do not read the IJ to have made the error of law that Morris discerns.

Contrary to Morris' contention, the IJ expressly stated at the outset of its opinion that it had considered the "background evidence" that Morris had submitted, including the "articles pertaining to . . . Jamaica's human rights record." The IJ then went on to find that Morris' expert, Harriott, could only speculate as to whether Clarke would coordinate with the JCF in the event that he chose to harm Morris.

We thus do not read the record to show that the IJ considered only Harriott's testimony in assessing the strength of Morris' showing as to the likelihood that Clarke would rely on the assistance of the JCF to target him. Rather, we read the record to show that the IJ weighed all of the evidence in finding that Morris' showing concerning the likely involvement of the JCF in any plan by Clarke to target Morris was too speculative. For this reason, Morris' reliance on Mukamusoni is misplaced.

The record is at odds, therefore, with the premise underlying Morris' argument that the IJ made an error of law in finding that Morris did not satisfy his burden to show that it was more likely than not that the harm that he contends that he would suffer would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). And, because Morris identifies no other error of law that the IJ (or, by extension, the BIA) made as to that issue, Morris' challenge to the order denying his deferral of removal claim, insofar as it is based on the exception to the jurisdictional bar, necessarily fails.

**B.**

Morris separately contends that the jurisdictional bar simply does not apply to a petition for review from an order denying a claim for deferral of removal. He argues that an order

of deferral of removal is not an order encompassed by 8 U.S.C. § 1252(a)(2)(C)'s reference to "any final order of removal." He thus argues that we may review his petition even if he is not challenging the rulings below on the ground that either the IJ or the BIA made an error of law. On the basis of this contention, Morris therefore argues that there is no jurisdictional bar to our review of his challenge to the sufficiency of the evidentiary support for the findings that the IJ made. See Morgan v. Holder, 634 F.3d 53, 57 (1st Cir. 2011) (noting that "rejecting a factual finding is inappropriate unless the record is such as to compel a reasonable factfinder to reach a different conclusion.")

Morris acknowledges that we have previously treated petitions for review of orders denying deferral of removal claims as if they were subject to the jurisdictional bar that 8 U.S.C. § 1252(a)(2)(C) establishes. See Gourdet v. Holder, 587 F.3d 1, 5-6 (1st Cir. 2009); Magasouba v. Mukasey, 543 F.3d 13, 14 (1st Cir. 2008). But, he rightly points out, the petitioners in those cases did not challenge the applicability of the jurisdictional bar as he now does. Moreover, as Morris also notes, although some other circuits have adopted the government's position that the jurisdictional bar does apply to orders denying claims for deferral of removal, other circuits have rejected it. Compare Ortiz-Franco v. Holder, 782 F.3d 81, 86 (2d Cir. 2015), Saintha v. Mukasey, 516 F.3d 243, 247-48 (4th Cir. 2008), Balogun v. Ashcroft, 270 F.3d

- 13 -

274, 279 (5th Cir. 2001), and Ventura-Reyes v. Lynch, 797 F.3d 348, 358 (6th Cir. 2015), with Wanjiru v. Holder, 705 F.3d 258, 263 (7th Cir. 2013), Agonafer v. Sessions, 859 F.3d 1198, 1202-03 (9th Cir. 2017).

Notwithstanding Morris' arguments as to why we should join those circuits that have found that the bar does not apply, we need not decide whether it does.[2] Even if we assume that the bar does not apply to orders denying deferral of removal claims, Morris' petition still must be denied. See Telles v. Lynch, 639 F. App'x 658, 659 (1st Cir. 2016) (assuming hypothetical jurisdiction when the petitioner does not state a colorable constitutional or legal claim and that substantial evidence supports the IJ's holding that the petitioner has not established a "reasonable possibility" of persecution or torture).

We reach this conclusion because we do not see how the record may be read to compel the conclusion that Morris satisfied his burden to show that the harm that he fears from Clarke would

---

[2] To the extent that Morris argues that we have jurisdiction pursuant to 8 U.S.C. § 1252(b)(9), we are skeptical that this provision independently confers jurisdiction that does not otherwise exist. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999) (describing § 1252(b)(9) as an "unmistakable 'zipper' clause"); see also Mahadeo v. Reno, 226 F.3d 3, 12 (1st Cir. 2000) (explaining that a zipper clause "consolidates or 'zips' 'judicial review' of immigration proceedings into one action in the court of appeals.")

be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). In so concluding, we note that substantial evidence supports the IJ's finding that Morris' key witness concerning the practices of the JCF, Harriott, "could only speculate as to . . . whether [Clarke] would outsource any murder or murder for hire to the police, or another organization."

In testifying about the prevalence of drug-trafficking networks in Jamaica involving corrupt police officers in their efforts to enact violence, Harriott testified, for example, that he was aware of several cases in which drug-trafficking networks in Jamaica contracted with police to carry out retribution on informants and that he was "not aware of any case in which the punishment for being an informant or being suspected of being an informant is anything less than death." But Harriott did not focus on the particular practices of the British Link-Up Crew. Rather, in offering that testimony, he described the practices of drug trafficking networks "in general."

Moreover, the IJ found that Harriott was of the view that "[Clarke's] role is such that he probably has some contacts remaining in the police force, and he may 'possibly' use them as contacts against the respondent," and that description is not clearly contradicted by the record. After all, Harriott did not

testify that it was more likely than not that Clarke would use the JCF to target Morris.  He instead testified only that Clarke likely had contacts with the JCF and that using police officers is a "low risk way of [delivering violence]."

Nor does Morris' documentary evidence suffice to make up for the limitations in Harriott's testimony.  That documentary evidence -- from such sources as the United States Department of State, the Inter-American Commission on Human Rights, and the United Nations -- describes "the rampant corruption and criminality within the Jamaican police in general, and connections between the police and criminal gangs and organized crime in particular."  But that documentary evidence does not discuss Clarke or his gang in particular.  In fact, Morris does not contend that anything in this general documentary evidence -- in and of itself -- compels the conclusion that Clarke would be more likely than not to involve the JCF in the event that he targeted Morris for harm.  Thus, Morris cannot show that the record, when considered as a whole, compels the conclusion that he has met his burden to show what he must to demonstrate that he is entitled to deferral of removal pursuant to 8 C.F.R. § 1208.17(a).

**III.**

The petition for review is **denied.**

- 16 -